knowledge on his part. The question, therefore, of the good faith of the applicant, must be held against him. The question as to whether the business may be carried on in a town where no license has been voted for by the people is not dependent upon the act of the clerk, nor can the good faith of the county treasurer in issuing a certificate protect an applicant. I know of no way that the court, upon such an application as this, can undertake to protect an applicant against the consequences of an application which he knew was unauthorized when he made it. To refuse the application to cancel the certificate, it seems to me, would be a plain violation of duty. If the consequence of the cancellation of the certificate is the loss of the fees paid, it is a loss due entirely to the action of the applicant himself, and one which he must bear. The application must be granted, but, under the circumstances, without costs.

Application granted, without costs.

(28 Misc. Rep. 71.)

### OSWEGO COUNTY SAV. BANK v. TOWN OF GENOA.

(Supreme Court, Trial Term, Onondaga County. June, 1899.)

1. EVIDENCE—ADMISSIBILITY OF COPY OF ASSESSMENT ROLL.
    2 Rev. St. (8th Ed.) p. 1105, § 36, providing that the boards of county supervisors shall deliver the corrected assessment roll, or a fair copy thereof, to the collector, does not operate to make such copy admissible as evidence.

2. RAILROAD AID BONDS—ISSUE BY TOWN—AUTHORITY.
    Under Laws 1866, c. 398, providing that bonds in aid of a railroad company shall not be issued by a town until consents of the owners of more than half of the taxable property have been obtained, and providing that the existence of the necessary number of consents shall be proved by an affidavit of the assessor or county clerk, where the requisite number of consents, proper in form, and verified by such affidavit, have been introduced, a prima facie case is made as to the validity of this part of the proceedings.

3. SAME—LOCATION OF ROAD.
    Under the Western Extension act of 1871 (Laws 1871, c. 298), authorizing the New York & Oswego Midland Railroad Company to extend its road from the city of Auburn to any point on Lake Erie or the Niagara river, and authorizing any town through or near which it passes to issue bonds in aid of the road, it is not sufficient for the road to establish one terminus and a further location through the town issuing bonds, but it is necessary that the entire line be established before any town can issue bonds.

4. DETERMINATION TO BUILD ROAD.
    A resolution by the directors of the New York & Oswego Midland Railroad Company fixing a branch of said road commencing at Norwich, and running through certain towns to Auburn "on condition that the towns on the line consent to bond for, or procure by subscription, the amount assessed to them," and a resolution reciting that the road was far enough advanced to justify building such branch, and directing the president and engineers to make surveys, sufficiently indicate a determination to take advantage of the authority conferred by Laws 1867, c. 917, § 3, and Laws 1869, c. 84, authorizing said road to build a branch from any point in Chenango or Madison county, through certain other counties, to Auburn, whenever, in the judgment of the directors, it should be for the interest of the company.

5. SAME—LOCATION OF ROAD AS CONDITION PRECEDENT.
    Under Laws 1867, c. 917, § 3, authorizing the New York & Oswego Midland Railroad Company to construct its Auburn Branch, and authorizing the towns along the line or interested in its construction to issue bonds in

aid of the road, the location of the entire line is a condition precedent to
the authority of any town to issue such bonds.

**6. RAILROAD—AUTHORITY FOR CONSTRUCTION.**

Act 1867, c. 917, and the Western Extension act of 1871, both authorized
the New York & Oswego Midland Railroad Company to construct a branch
road from Auburn. The act of 1871 authorized the road to be built into
Tompkins county, which was not authorized by the act of 1867. There
were some other differences in the authority conferred by the two acts.
In the construction of the road, resolutions referred to it as the "Western
Extension," and referred especially to the act of 1871 as the authority for
its construction. The line was built through Tompkins county. The maps
filed were marked "Auburn Branch," which was the name used by the act
of 1867. *Held*, that the road must be considered as constructed under au-
thority of the act of 1871, and that its construction is not a compliance
with the requirements of the act of 1867.

**7. TOWN BONDS IN AID OF RAILROAD—AUTHORITY—NOTICE TO PURCHASERS.**

Where bonds issued by a town in aid of a railroad recite on their face
that they are issued under the provisions of an act authorizing towns so to
subscribe, passed April 5, 1866, and several acts amendatory and supple-
mentary thereto, especially the act passed April 5, 1871, such bonds are
notice to bona fide purchasers that the road was constructed under the pro-
visions of the act of 1871, and puts upon such purchasers the duty to deter-
mine whether such act has been complied with.

**8. SAME—ESTOPPEL.**

Where bonds have been irregularly issued by a town, and the town has
paid interest on them, but has established no element of estoppel in favor
of plaintiff, such payment of interest is not sufficient to cure the jurisdic-
tional defect.

Action by the Oswego County Savings Bank against the town of
Genoa. Findings for defendant ordered.

Giles S. Piper and I. T. Deyo, for plaintiff.

Underwood, Storke & Seward and Theodore Bacon, for defend-
ant.

HISCOCK, J. The town of Genoa is situated in Cayuga county,
south of Auburn, and near the southern line of said county. Some
time before the occurrences especially involved in this action, the
New York & Oswego Midland Railroad Company had been incorpo-
rated for the purpose of constructing a railroad from Oswego to
or near Jersey City, through cetain counties, of which Cayuga county
was not one, and had entered upon the construction of said railroad.
By chapter 398 of the Laws of 1866 provision had been made for
the bonding by towns in certain counties through which it was
expected said road would run, in aid thereof, and the method pointed
out and prescribed by and in accordance with which such bonds might
be issued. Some of the essential provisions of this act were that
the county judge of any county, upon the application of 12 or more
freeholders, residents of any town or city in such county, might
appoint three freeholders as commissioners in said town or city to
carry into effect the purposes of this act. It was made lawful for
said commissioners to borrow on the faith or credit of such town or
city such sum of money as the taxpaying inhabitants thereof should
fix upon by their assent in writing or by votes, not exceeding 30 per
cent. of the assessed valuation of the real and personal property of
any town or city as shown by the assessment roll for the year 1865,

and at a rate of interest not exceeding 7 per cent., for a term not exceeding 30 years; provided, however, that such powers and authority to issue said bonds should only be exercised upon the condition that the consent should first be obtained in writing of a majority of the taxpayers in said town or city owning or representing (as agent, president, or otherwise, including owners of nonresident lands) more than one-half of the taxable property of said town or city assessed and appearing upon the assessment roll of the year 1865. Then followed certain other provisions with reference to such assents. In 1867, 1869, and 1871 acts were passed authorizing, in substance, among other things, the construction by said New York & Oswego Midland Railroad of certain branches, and authorizing, by the towns and cities in certain counties under certain conditions, the issue of bonds in aid of said railroad, which acts are especially under consideration in this action.

The act of 1867 (being chapter 917) was entitled "An act to facilitate the construction of the New York and Oswego Midland Railroad, and to exempt from certain taxation town and city bonds used in the construction thereof." Section 3 thereof, which is especially material, provided that:

"The board of directors of said New York and Oswego Midland Railroad Company are hereby authorized to construct a branch railroad from the line of the said railroad at any point in the counties of Chenango or Madison through the counties of Chenango, Madison, Cortland, Cayuga to the city of Auburn, in the county of Cayuga, whenever, in the judgment of the directors, the same shall be for the interest of such corporation. * * * And the towns and cities along the line of the said branch railroads (the construction of other branches than that above named having been provided for) or interested in the construction thereof, in any county through which said road shall run, shall have the same right, authority and power to subscribe for stock and to make and issue therein bonds to aid in the construction thereof as is given by this act and by chapter 398 of the Laws of 1866."

By chapter 84 of the Laws of 1869, said section 3 of chapter 917 of the Laws of 1867, just quoted, was amended by adding Onondaga as one of the counties through which the branch to Auburn might be constructed. The railroad provided for in the two acts just quoted from has been generally referred to in this case as the "Auburn Branch." Chapter 298 of the Laws of 1871, above mentioned, was entitled "An act to authorize the New York and Oswego Midland Railroad Company to extend its road, and to facilitate the construction thereof." It was passed April 5, 1871. Section 1 thereof provides as follows:

"The New York and Oswego Midland Railroad Company are hereby authorized and empowered to extend and construct their railroad from the city of Auburn, or from any point on said road, easterly or southerly from said city, upon such route and location, and through such counties, as the board of directors of said company shall deem most feasible and favorable for the construction of said railroad, to any point on Lake Erie or the Niagara river, * * * and any town, village or city in any county, through or near which said railroad or its branches may be located, except such counties, towns or cities as are excepted from the provisions of the general bonding act [and which exceptions are not material in this case] may aid or facilitate the construction of the said New York and Oswego Midland Railroad and its branches and extensions, by the issue and sale of its bonds in the manner provided for in the act entitled," etc.

—Referring to the act, chapter 398 of the Laws of 1866, already quoted from. This act and the railroad therein provided for have been commonly referred to in this action as the "Western Extension" act and branch. Upon August 28, 1871, there was filed in the Cayuga county clerk's office the consents of taxpayers of the town of Genoa to the bonding thereof, upon which the bonds in question are based. Said consents were accompanied by the affidavits of the town clerk of Genoa, made August 22, 1871, that the requisite taxpayers had consented to the bonding. September 9, 1871, the county judge of Cayuga county appointed, under the acts hereinbefore referred to, the commissioners for said town of Genoa to issue said bonds. Said bonds are dated December 1, 1871. The commissioners for the town of Genoa, under the bonding acts, took their oath of office February 7, 1872, and said bonds were issued from time to time between March and December, 1872. Said bonds recite that they are issued under the provisions of an act of the legislature of the state of New York entitled "An act to facilitate the construction of the New York & Oswego Midland Railroad and to authorize towns to subscribe to the capital stock thereof," passed April 5, 1866, and the several acts amendatory thereof and supplementary thereto, especially the act entitled "An act to authorize the New York and Oswego Midland Railroad Company to extend its road and to facilitate the construction thereof," passed April 5, 1871, and to which act especial reference has been made herein.

I take up first the defense urged,—of lack of consents by taxpayers of defendant to the issue of the bonds in suit. The question which I shall discuss as decisive of such defense is whether defendant has given any proofs of the total number of taxpayers and the total amount of taxable property in the town by which to measure that covered by the consents, and show that they are not sufficient. Reference has already been made to the statutory provision that these bonds could only be issued upon the written consent of a majority of the taxpayers of the town owning and representing more that one-half of the taxable property of the town, which consents were to be acknowledged, etc. The provision of the original statute (chapter 398, Laws 1866) was that the sufficiency of the consents (as to amount, etc.) was to be determined by reference to the assessment roll for the year 1865. Chapter 298, Laws 1871, however, provided that, "in determining the names and numbers of the said taxpayers and the property assessed, reference shall be had only to the last preceding assessment roll of the said town, village or city, which assessment, and no other, shall govern in all cases where consents shall be hereafter given or obtained." The "last preceding assessment roll," it was further provided, should be the roll last preceding the date of the acknowledging or proving the consents given. In this case it was the assessment roll for 1870. It was further provided (chapter 398, Laws 1866) that the fact that the necessary number of consents had been obtained should "be proved by the affidavit in writing of one of the assessors of said town, or by the affidavit of the town or county clerk," etc. The consents proper in form, and verified as to their sufficiency in number and amount

by an affidavit such as is above provided, have been put in evidence.
A prima facie case in favor of the plaintiff has thus been established.
The only proof by which defendant has sought to overthrow this is
by a copy of the assessment roll in question delivered by the board
of supervisors to the town collector as part of his warrant. This
question of the sufficiency of this evidence was duly raised by ob-
jection, and is fairly presented. It is insisted by plaintiff that the
evidence thus offered with which to compare and by which to meas-
ure the sufficiency of the consents was subject to the technical ob-
jection of being a mere copy of an assessment roll, and therefore
not the best evidence, and that there were practical and serious ob-
jections to it as such. I think plaintiff is right, and that it was not
competent.

The assessors of the town of Genoa (as of any other town) were re-
quired to complete their assessment roll on or before August 1st.
It was then subject to correction. After hearing complaints, it
was the duty of the assessors to review their assessments and com-
plete their roll, which, properly certified as provided by statute, it
then became their duty, on or before September 1st, to deliver to
the supervisor of the town, who in turn was required to deliver it
to the board of supervisors at their next meeting. The board of
supervisors had the power to correct any omissions or errors of
certain classes in the roll, and to equalize the assessed valuations
of the different towns, and extend the taxes. Then it was the
duty of the board to cause "the corrected assessment roll, or a fair
copy thereof, to be delivered to the collector," etc., and to this as-
sessment roll or copy was to be attached the warrant to the col-
lector for the collection of the taxes. It was this "fair copy" of the
assessment roll, certified to by the supervisor of the town to be a
true copy, and attached to and a part of the collector's warrant,
which defendant offered in evidence. Independent of the statute
authorizing the use of a copy of the assessment roll as part of the
collector's warrant, it would not at all be claimed that the evidence
was other than secondary or incompetent. The statute does not
seem to me to make it competent in the connection here involved.
For the purposes of the warrant, and for the acts and protection of
the collector, a copy was, by the statute, made just as effective as
the original roll. It was proper to make that or any other similar
provision. The statute might have dispensed with the use of even
a copy, and provided for the statement of the taxes to be collected
in some other form. The legislature deemed it would be safe to
let the collector proceed upon a copy. But it calls it a copy, and
treats it as such. It may become, in effect, as part of the warrant,
an original. But the statute does not generally and for all purposes
purport to make the copy an original. The original and only
original assessment roll continues to be the one prepared by the
assessors, and transmitted to the board of supervisors. And while,
in passing upon acts in connection with the collection of taxes,
reference will be proper to a copy, because the statute permits it,
when it comes to determining how many taxable inhabitants and
how much taxable property the assessors have determined to be in

a town, reference ought to be made to the original papers in which they have recorded their determination. The statute providing for the use of the copy, when applied to the giving of evidence, infringes upon a very broad and well-settled rule, and it should not be extended beyond its clear terms, and be made the authority for using such copy for other purposes than those specified. It was held in Town of Solon v. Williamsburgh Sav. Bank, 35 Hun, 1, that the term "assessment roll" in such a connection as this means the list or roll of taxable property and persons, completed, verified and deposited by the assessors, and not as it appears after equalization by the board of supervisors. Such decision would render incompetent even the original of which the copy was offered in evidence. If the foregoing views are correct, there is no roll with which to compare the consents in evidence, and no proof establishing in opposition to the affidavit accompanying them that they are insufficient.

I next pass to the consideration of the various questions involved in the defense that no such action was ever taken by the railroad company determining to build and locating a line of road as was necessary as a condition precedent to the issue of the bonds in question. Outside of the constitutional defense raised, it is conceded that either the Auburn Branch or the Western Extension acts contain sufficient authority for the issuing of the bonds in question. The case has been tried upon the theory—and, I think, correctly—that plaintiff might look to either of said acts as an authority and power for the issuing of the bonds, and, barring the constitutional question, if it could bring them within the provisions of either act, it was entitled to succeed. There has been considerable litigation over bonds issued in aid of the railroad in question by other towns similarly situated as defendant, and some of them in the same county. In some of the cases so arising the right of a town situated as defendant to issue, under the so-called "Western Extension Act of 1871," bonds like those in question, has been so passed upon, upon facts substantially like those presented here, that I regard that question as substantially adjudicated, and will consider it first. Under the provisions of that act, as has been observed, the railroad was authorized to "extend and construct their railroad from the city of Auburn, or from any point on said road, easterly or southerly from said city, upon such route and location, and through such counties, as the board of directors of said company shall deem most feasible and favorable for the construction of said railroad, to any point on Lake Erie or the Niagara river, and any town, village, or city in any county through or near which said railroad or its branches may be located" was authorized to bond. It will be observed that the directors of the railroad company, if they decided to build the branch in question, had a very large discretion as to where it should be located. In order to avail themselves of the powers and permission granted by the act, they were called upon to do two things, viz. determine to build the branch or road in question, and, secondly, fix upon a route or location which should seem most feasible and favorable for its construction. It is so well settled as not here to require citation of authorities

that the mere passage of the act in question did not authorize the defendant to issue any bonds in aid of the construction of a railroad permitted or authorized by this act.   But it was necessary that the railroad through its board of directors should first take the necessary steps looking to the construction of the road.   The branch authorized by the act was never in fact, either before or after the execution and delivery of the bonds in question, constructed, or even located.   A complete route through to Lake Erie or the Niagara river was never even determined upon by a resolution of the board of directors.   Under the Auburn Branch act a road was constructed, and located from the main line of the railroad at Norwich through to Cortland before the passing of the act of 1871, and thereafter, whether under the Auburn Branch act or the Western Extension act, as will hereafter be discussed, a line of road was adopted, such as was permissible under the Western Extension act, through the defendant to a point north of it and south of Auburn. This line was adopted before the actual issue of the bonds in question, and in part, at least, after the proceedings had been instituted for their issuance.   Still later, and after the bonds had been actually issued, a road was built upon the line in question to and through defendant towards Auburn.   But never at any time was any route under the Western Extension act adopted in any manner, either by statutory location or otherwise, between a point near Auburn and Lake Erie or the Niagara river.   Even if it be assumed that the proceedings upon the part of the board of directors of the Midland road, in selecting a route from Cortland northerly through defendant, was a sufficient "location" of a route, and that it may be regarded as a location of a route to be built under the Western Extension act, rather than the Auburn Branch act, there was still a large space between the terminus of the route as so located and the final terminus of Lake Erie or the Niagara river mentioned in the act between which there was no location or designation of the route whatever.   Upon facts appearing substantially as in this case, it has been held by the United States courts that the authority given by the act of 1871 to towns to bond in aid of a road to be constructed under said act was predicated upon a prior location of the road through and over the entire and complete route mentioned by the statute; that it was not sufficient to fix one terminus, as at Cortland, and a further location through the town which was issuing its bonds; but it was necessary that the termini and the location of the entire line should be fixed before any town could issue bonds.   Mellen v. Town of Lansing, 19 Blatchf. 512, 11 Fed. 820; Id., 20 Blatchf. 278, 11 Fed. 829; Thomas v. Town of Lansing, 21 Blatchf. 119, 14 Fed. 618; Purdy v. Same, 128 U. S. 557, 9 Sup. Ct. 172; People v. Morgan, 55 N. Y. 587.   The cases in the United States courts, above cited, adjudicate directly and specifically the question here discussed, which is presented here in substantially the same form as in those cases.   Their doctrine is not in any manner questioned by any case in the courts of this state which has been called to my attention, but rather confirmed.   I see no opportunity to distinguish the case at bar upon this point from those above decided, or any reason for further discussing this branch of the case, which

seems to be so completely covered. I therefore reach the conclusion that the bonds in suit cannot be sustained as valid under the provisions of the act of 1871. And I pass to the consideration of the other question, whether they can be so sustained and held valid under the acts of 1867 and 1869, relating to the Auburn Branch, and upon the acts performed by the railroad company thereunder.

It has been already observed that these acts authorized the New York & Oswego Midland Railroad Company to construct a branch from the line of its road at any point in the counties of Chenango and Madison, through the counties of Chenango, Madison, Cortland, Cayuga, and (as subsequently amended) Onondaga, to the city of Auburn, whenever, "in the judgment of the directors, the same shall be for the interest of said corporation." And the towns and cities "along the line of said branch railroads or interested in the construction thereof, in any county through which said road shall run," were authorized to bond, etc. The passage of the act did not authorize the defendant to bond. But before it could have any such authority the board of directors of the railroad company must have exercised the discretionary power vested in them to establish a branch railroad through the county of Cayuga. Bonds could not be issued before the branch road was located, or the board of directors of the company had determined whether or not they would exercise the privilege of constructing the branch. People v. Morgan, 55 N. Y. 587. I propose, therefore, to consider, in connection with these acts and these bonds—First, whether the New York & Oswego Midland Railroad Company, through its board of directors, did determine to exercise the discretionary power vested in it to build and establish this branch; second, if it did, what was necessary for it to do in the way of "locating" the route of such branch before proceedings could be lawfully instituted for the issuing of the bonds by defendant; third, whether it complied with the requirements of law in respect to a location of its route. There was no controversy upon the trial but that it was necessary for the railroad authorized to construct this Auburn Branch to accept the franchise and powers conferred upon it, and determine to construct said branch before proceedings could be lawfully taken by defendant to issue its bonds. There was a controversy as to whether it had ever so done. There was never any formal action taken by the company which has been called to my attention wherein it explicitly and in words directly determined and resolved that it would take advantage of the powers conferred by the acts in question, and construct the road therein provided for. I shall hold, however, that it was not necessary for it to do this, but if, from all of its acts as bearing upon this question, it can be fairly inferred and deduced that it did reach such determination, it will be sufficient. I am inclined to think that the road did at one time reach and indicate the determination to accept and act under the power conferred upon it to construct the branch in question. September 11, 1867, its board of directors passed the following resolution, viz.:

"Resolved, that under and in pursuance of the power and authority vested in this board by virtue of an act passed by the legislature of the state of New

York, entitled 'An act to facilitate the construction of the New York and Os-wego Midland Railroad,' passed May 15, 1867, we hereby fix and locate a branch of the said New York and Oswego Midland Railroad, commencing at the village of Norwich, in the county of Chenango, and running from thence by the most feasible route through or near the towns of Plymouth, Otselic, Georgetown, De Ruyter, and Skaneateles to the village of Auburn, upon the condition that the towns upon the line consent to bond for, or procure by personal subscription, such amounts as shall be assessed upon the respective towns by this board; and said road may be put under contract from Norwich to De Ruyter when the amount necessary shall be furnished by the several towns along the line."

This resolution and action was, by its terms, conditional, and, in my judgment, would not be sufficient alone to answer the purpose under discussion.    Upon the next day after the adoption of this resolution an address was issued by the road, evidently referring to it, and stating that the company had located a branch from its main line at Norwich, by way of Plymouth and Otselic, to De Ruyter, and thence to the city of Auburn.    Various resolutions were adopted from time to time with reference to running possible lines through to Auburn. A road was actually constructed from Norwich upon the line running through to Cortland, and upon August 19, 1870, the following resolution was adopted, viz.:

"Resolved, that the construction of this road is so far advanced as to justify the immediate extension of the line from Truxton to Auburn, and to that end be it further resolved, that the president and engineer be directed to examine the intermediate country and make further surveys of the same."

There are some other resolutions which perhaps bear upon this question, but, taking into account the resolutions and acts to which I have referred, I think they fairly indicate an intention upon the part of the company at this time to build an Auburn branch from Norwich to Auburn.

Reaching this conclusion upon this point, the next inquiry which presents itself is, what was it necessary for the railroad company to do in the way of locating its line before the bonds could be issued? It is insisted by defendant that before they could be issued it was necessary that the entire branch authorized by the acts of 1867 and 1869 should be located, and that no sufficient location thereof was made.    I have followed the decisions holding that in the case of the Western Extension authorized by the act of 1871 it was necessary that such location of the entire branch should be made before any town could issue its bonds; that even a location of the route through the town issuing the bonds was not sufficient.    If those decisions, and the principles upon which they are based, apply to the earlier acts now under consideration, they will be regarded as decisive of this question.    In deciding that the location of the entire route under that act was a condition precedent to the issuing of bonds by any town, the various decisions hold, among other things, in substance, that under this act a very wide discretion was given to the company as to where it would locate this branch; that the exercise of this discretion in laying out and defining the entire route was a condition precedent to the issue of bonds; that the act intended this, and that it was a matter of safety to the towns; that they could not safely and wisely determine the question of issuing the bonds in aid

of the construction of this branch until it was known where it was to
run in its entire length; that the location of it through a particular
town, in the absence of the location of the rest of the line, would not
prevent an abandonment or change of route after a town had issued
its bonds.    It is difficult to see why this reasoning should not be ap-
plicable to the earlier acts.    It is true that the directors of the com-
pany did not have so wide a discretion in the location of the Auburn
Branch as in the case of the Western Extension.  But still this discre-
tion was large enough to make it very difficult for a town to deter-
mine whether it was to be "along the line of said branch railroad or
interested in the construction thereof," and in the county through
which the road was to run, as provided in the act, until the entire
branch had been located.    The construction of the line might run
through part of the counties named in the act without going near
the others.    As a matter of fact, if constructed upon any ordinary
principles of shortness, it could not possibly go through all the
counties named in the act.    Take the case of the defendant, with
its location in Cayuga county south of Auburn.    Assume that the
company had located its line from one starting point authorized by
the act, namely, Norwich, to Cortland, at the time the bonds were
issued, but had not located its line beyond that point to Auburn, it
might take any one of several routes from Cortland to Auburn.    It
might so pass to the easterly of the defendant as not to touch it,
or afford it practically any communication with the city of Auburn.
Certainly, under those circumstances, the defendant was not author-
ized to bond upon the theory that it was located within the language
of the statute upon the proposed branch.    Could it, upon the other
hand, intelligently determine whether it was "interested" in the con-
struction of the line until it knew where that line was to run?   It is
to be assumed that one of the weighty considerations in determining
the matter of such interest of this defendant would be whether it was
to be connected with Auburn, the principal city and county seat of
the county wherein it was situated.    And, as stated, it was entirely
feasible for the road to continue the branch to Auburn, under the lan-
guage of the statute, by such route that it would never be any appre-
ciable distance nearer the defendant than it was at Cortland.    It
seems to me, therefore, that the reasoning by which the courts reach
their decisions as to the Western Extension act is entirely applicable
to this act, and that a location of the entire branch was a condition
precedent to the issuing of the bonds.

.   Considerable discussion was had upon the argument as to the force
of People v. Morgan, 55 N. Y. 587, as an authority upon this question,
it being claimed by the defendant that it was, and it being insisted
by the plaintiff that such facts were not presented to the court in that
matter as to make its decision binding in this case.    All of the facts
which appear in this case manifestly were not before the court in that
proceeding, and still certain views were expressed as to the meaning
and construction of the acts there and now here under review which
seem to be applicable.    The court, speaking of these acts, says:

"It is obvious that the mere passage of these acts conferred no authority upon
the town of Scipio to issue bonds.  *  *  *  It clearly was not the intention

of the act that any town should issue bonds unless the road should run through it, or through the county in which the town was situated. Yet this result might follow if the town bonds should be issued before the branch road was located, or the board of directors of the company had even determined whether or not they would exercise the privilege of constructing the branch."

Then follows language which seems to put upon these prior acts the same construction as has been placed upon the act of 1871, with reference to the location of the entire branch.   The court says:

"The act of 1871 is subject to the same observations.   It authorizes another branch from Auburn to Lake Erie, or the Niagara river, upon such route and location and through such counties as the board of directors shall deem most favorable, and provides that any town, etc., in any county, through or near which said railroad or its branches may be located, may issue bonds, etc.   The location of the road or branch is here again made a condition precedent to the right to issue bonds, and there is a total absence of proof that any such location had been made at the time of the proceedings to bond the town of Scipio."

It seems to me that all of the reasoning which is applicable to the act of 1871 is applicable to the earlier acts; perhaps in a lesser degree, but still applicable.   In the latter act the directors were given a discretion which embraced very nearly half of the state as to the location of their line.   In the acts relating to the Auburn Branch they were given a discretion which, it is true, was limited to certain counties, but still they had the power, by the location of the road at one point or another within those counties, to make the interest of any given town about as remote as it could have made it under the wider provisions of the act of 1871.   I have endeavored to point out how this was so as to the defendant.   Under the act of 1871 those towns were authorized to bond through or near which said Western Extension might run.   In the act of 1867, as amended, the towns and cities were authorized to bond which might be "along the line of the said branch railroad, or interested in the construction thereof."   That is, in each case towns were authorized to bond which were located upon the line of the branch, and then, in addition, under one statute those additional towns were authorized to bond which might be "near" the road, and under the other statute which might be "interested in the construction" thereof.   So that practically, under the acts, the same classes of towns and cities were authorized to bond, and, if it was necessary and proper under the provisions of the act of 1871 that any town or city desiring to bond should first know where the entire line of road was to be located, it would seem to be equally true in the other case.   It is suggested, however, that the defendant was situated in the county of Cayuga; that when the railroad company determined to build the Auburn Branch that that of necessity led it into the county of Cayuga, and therefore obviated any further location of the line so far as defendant was concerned.   This reasoning, however, does not seem to be good.   The construction of the road to Auburn would not necessarily lead it through defendant, and therefore authorize it to bond upon the theory that it was located upon the line of the road.   When it came to the determination of whether the town was "interested" in the construction of the road it seems to have been quite as essential for it, located in Cayuga county, to know where the line was to be located, as for any other town outside of that county,

for the road might run into Cayuga county to Auburn, and still be too remote for any practical purposes for defendant. In this respect the case differs from that of Phelps v. Town of Lewiston, 15 Blatchf. 131, Fed. Cas. No. 11,076, relied upon by the plaintiff. In that case towns located upon the line of the road were specifically authorized to bond. The railroad company accepted the franchise which was granted to it, which fixed the termini, and, among other things, necessitated the building of the road to Lewiston. There was no way for it to get to this terminus without going through the town of Lewiston, and therefore there was no escape from the proposition that that town necessarily must be located upon its line, and therefore specifically authorized, under the wording of the statute, to issue bonds

Reaching these conclusions, it then becomes necessary to determine whether there had been any sufficient location of the entire line of the Auburn Branch at the time the proceedings were instituted and perfected to issue these bonds. It is insisted by defendant that the necessary "location" in this connection is the technical and statutory one provided for filing maps, profiles, etc., and this does seem to be the construction adopted in the case of People v. Walter, 2 Hun, 385, 388. It is true that the decision reached in that case was not ratified upon appeal to the court of appeals (68 N. Y. 403), but the failure to so affirm it does not seem to have touched upon or impaired the rule laid down as just quoted. In the cases in United States courts already referred to, so strict a rule against the bonds was not laid down. Those cases seem to have proceeded upon the theory that a definite location of the road which would be sufficient to hold the railroad company to its just and equitable obligations to a town bonding in its behalf would be enough. For the purposes of this case I shall adopt the less stringent rule. Was there a sufficient location of the entire line, even under it? If all the acts performed by the railroad company in locating and building a line of road from Norwich towards Auburn before these bonds were actually issued could be regarded as having been done under the Auburn Branch acts, I think there would have been. It is to be remembered, in this connection, that the consents to bond defendant are dated June 20, 1871, verified as to sufficiency August 22, 1871, and filed in county clerk's office August 28, 1871. The petition to the county judge for appointment of commissioners was dated September 6, 1871, and the commissioners appointed three days later. The bonds were dated December 1, 1871, but were not actually issued until various dates between March and December of the following year. The commissioners did not take oath of office until February 27, 1872. Upon September 9, 1871, the date when commissioners were appointed to issue the bonds, the road had been actually built and routed by maps and profiles filed in the proper offices from Norwich to Cortland, and this had unquestionably been done under the Auburn Branch acts. Between that date and January 1, 1872, a definite route had been adopted by filing maps, profiles, and otherwise, through and beyond defendant towards Auburn. Subsequently, and on May 30, 1872, by filing of maps and profiles, the route was continued to the so-called "Merrifield Road," which was only a few miles from Auburn, and on a feasible line to it. The

road was actually opened for traffic through to defendant in October, 1872, and to a point still further on in December following.   If all of these acts, done before the bonds were actually issued, could be credited to operations under the acts of 1867 and 1869 (and the question is to be considered hereafter whether they should be so credited), I think there would have been a sufficient location of the road to sustain the bonds.   The road would have been actually built and definitely routed through and beyond defendant to within a few miles of Auburn. The terms of the acts under which this had been done would have fixed the terminus, Auburn, and, within very narrow limits, the line over which the remaining few miles of road must be located and built, and there would have been such a substantial compliance with the principles of the decisions hereinbefore referred to relating to the Western Extension, as would have prevented any of the dangers liable to arise from nonlocation of the entire route before bonds were issued.   The fatal objection to following this view, however, as I regard it, is that the acts of building and locating the line of road from Cortland on towards Auburn cannot fairly be regarded as having been performed under the earlier acts of 1867 and 1869.   I think that before the issue of the bonds in question the railroad company must be regarded as having changed its intention and abandoned the idea of building a branch under the Laws of 1867 and 1869, and having determined in place thereof from Cortland on to build the road under the so-called "Western Extension" act, and that the bonds in question must be treated as having been issued in aid of such latter road. The Western Extension act was passed April 5, 1871.   Between that time and November 16, 1871, various investigations and reports were made by and to the company upon the subject of a continuation of the line of the railroad to Auburn, and one or two maps of a route before reaching Cortland were filed, and marked "Auburn Branch," and it may be fairly inferred that up to that date the line of railroad as constructed and routed up to Cortland was under the provisions of the Auburn Branch acts.   Upon November 16, 1871, however, the board of directors adopted a resolution reading as follows:

"Whereas, the New York and Oswego Midland Railroad Company had for its original object the construction of a railroad from the city of New York to the city of Oswego; and whereas, since the organization of said railroad company, it has become desirable to extend the said railroad to Lake Erie or the Niagara river; and whereas, the legislature of the state of New York did by chapter 298 of the Laws of 1871, authorize and empower the said New York and Oswego Midland Railroad Company to build and extend their said railroad from the city of Auburn, or from any point easterly or southerly of said city to any point on Lake Erie or the Niagara river; and whereas, the said railroad company and its board of directors have decided to begin such extension and construction of said railroad westerly at and from the village of Cortland in the county of Cortland and westerly to Lake Erie or the Niagara river:   Therefore, be it resolved, that the board of directors of said railroad company hereby determine that the construction and extension of said railroad westerly commence at and from the village of Cortland, and thence to Lake Erie or the Niagara river."

And upon the same day another resolution was adopted, reading as follows:

"Resolved, that said New York and Oswego Midland Railroad Company, for the purpose of obtaining money and materials necessary to extend their said

railroad from the village of Cortland to Lake Erie or the Niagara river, hereby authorizes and directs its president and treasurer to borrow money to an amount not exceeding twenty-five thousand dollars per mile in length of its said railroad so as aforesaid to be extended and constructed, and to secure the repayment thereof to issue its first mortgage bonds," etc.

Thereafter such proceedings were taken by the company from time to time as resulted in the company's locating and constructing the line of its road southwesterly from Cortland into Tompkins county, and then northwesterly across Tompkins county up to and beyond the defendant. This was accomplished by making a trackage arrangement with another road running over a part of this distance, through purchasing an old roadbed running through Tompkins and Cayuga counties, and in laying some new roadbed. It will be noted at this point, in this connection, that under the Auburn Branch act the railroad company had no right to go into Tompkins county at all. In March, 1872, the president's report contained the following:

"The plans of the company have always contemplated a route to the westward, which has been pressed forward as fast as the means have been provided without embarrassment to operations on the original line between New York and Oswego. It is expected another year, or not later than the fall of 1873, will witness the extension of this line to some point on the Niagara river."

In June, 1872, another resolution was passed by the railroad company in place of the one heretofore referred to with reference to the issue of first mortgage bonds upon the Western Extension of its road from said village of Cortland to a point on Lake Erie or the Niagara river, and subsequently such mortgage was executed, and placed upon record. In January, 1873, a resolution was adopted by the board of directors "that the action of the president in locating and constructing the Western Extension of this company's road over and upon said Murdock Line [the old line of railroad heretofore referred to] be, and the same is hereby, approved." March 26, 1873, and subsequently, various resolutions were passed referring to the line of road constructed and being constructed as the "Western Extension." And, finally, before the road went into the hands of a receiver, in 1893, a resolution was adopted continuing the route beyond Auburn without going there, and upon a line which was permissible only under the act of 1871. These acts indicate that the company was engaged in operating, locating, and constructing its road from Cortland on under the act of 1871, rather than under the prior acts. Under them it had no right to go into Tompkins county. Unless the road was being constructed under the act of 1871, it was unauthorized, and without authority of law. As held by the court in Thomas v. Town of Lansing, 21 Blatchf. 119, 14 Fed. 618, in relation to other bonds upon this line, this road was not the Auburn Branch or the branch to Auburn authorized by the acts of 1867 and 1869. It was, so far as those acts were concerned, a branch without authority of law. Upon the other hand, there was authority for its construction under the act of 1871, and it is to be presumed that the board of directors intended to act lawfully, rather than unlawfully. It has been urged that the line might be regarded as constructed under the acts of 1867, 1869, and 1871, but that involves rather complicated theories and divisions in reference to its construction. It would in-

volve holding that the company constructed its line from Cortland to the line of Tompkins county under all the above acts; that then it abandoned work under the acts of 1867 and 1869 as it passed through Tompkins county, and proceeded under the act of 1871; and that then again, when it had reached the line of Cayuga county, it resumed operations under all the acts.    This seems a somewhat unnatural construction to put upon the acts of the company, and it seems to be more natural in the light of all that was done to find that, after the road had progressed in construction and routing as far as Cortland, and the act of 1871 had been passed, which gave authority to go through Tompkins county, the board of directors decided to proceed from that point on under its broader and more liberal terms, rather than under those of the prior acts.    I do not overlook the fact that from time to time maps filed of the route from Cortland county on were marked "Auburn Branch."    But this of itself does not conclusively settle that the road was being constructed under the earlier acts.    It is simply one of the facts which may be considered in determining the question under what law the company was proceeding. It is not sufficient, in my mind, to overcome the other facts to which I have, in part, at least, referred, indicating that the construction was under the act of 1871.    This inscription upon some of the maps filed is easily explained.    The road was desirous of securing the help by way of bonds from Auburn.    Under the act of 1871 it had a right, if it saw fit, to go into and through Auburn with its Western Extension.    It was probably deemed good policy while the proceedings for bonding were pending in Auburn to emphasize the fact that the railroad intended to go to Auburn, and there was nothing in the use of these words occasionally upon a map decisive of the question under discussion.

Now, with reference to the issue and form of the bonds themselves as bearing upon this question.    Some of the proceedings for the issue of the bonds had taken place before the passage of the resolution of November 16, 1871, which determined upon the construction of the road from Cortland on under the Western Extension act.    The bonds, however, were dated in December, and were not actually issued until some time later than that.    The consents which had been signed by the taxpayers for bonding the town were executed after the passage of the Western Extension act, and they authorized the execution of bonds as well under that act as under the prior acts.    The bonds, upon their face, recited that they were "issued under the provisions of an act of the legislature of the state of New York entitled 'An act to facilitate the construction of the New York and Oswego Midland Railroad, and to authorize towns to subscribe to the capital stock thereof,' passed April 5, 1866, and the several acts amendatory thereof and supplementary thereto, especially the act entitled 'An act to authorize the New York and Oswego Midland Railroad Company to extend its road and to facilitate the construction thereof,' passed April 5, 1871."    They thus indicate, upon their face, especially an intention upon the part of those issuing them to plant them upon the authority of the act of 1871, and such notice was given to those taking them, even bona fide holders, as threw upon them the responsi-

bility of determining whether they were thus issued in aid of a rail-road constructed under that act. The notice was broad enough, it seems to me, to cast upon even a bona fide purchaser the responsibility of determining whether the road in aid of which these bonds were issued was in fact a road constructed under the act of 1871 or under the prior acts. If I am correct in these views, and in the inferences to be drawn from the facts hereinbefore reviewed, such purchaser was chargeable with knowledge and notice of the fact that the road was being constructed and was being built under the act of 1871, and that the bonds were being issued in aid of such road. Thomas v. Town of Lansing, 21 Blatchf. 119, 129, 14 Fed. 618. It has already been held that there was no valid authority for so issuing them. I do not lose sight of the fact that Judge Blatchford, in the Thomas Case, says, in substance, that while the line of the road in question was unauthorized, and without authority as an Auburn branch, and could not be considered such, it also could not be considered as being built under the Western Extension act. But from the facts cited by him it would appear that some evidence presented in this case must have been absent in that. At any rate, the facts fairly indicate an attempt to build it under the latter act, rather than under the former ones.

The conclusions which I have reached upon this branch of the case render it unnecessary to consider the defense of unconstitutionality of the acts involved.

The defendant for a long time paid the interest upon these bonds. It has, at various times, done various acts which recognize, rather than deny, their legality. It is urged that thereby it has made them valid. No element of estoppel has been established in favor of plaintiff; and while, if defendant, as plaintiff in an equity suit, were seeking affirmative relief,—as to have the bonds declared invalid,—the acts mentioned might furnish a good reason for denying such relief, they are not sufficient in this suit to cure any jurisdictional defects in the bonds. So with the act to which I have been referred purporting to cure any errors or omissions of certain kinds in the issue of bonds such as these in suit. It does not purport to and could not remedy the difficulty which I have found to exist in this case. Findings may be prepared in accordance herewith, and, if not agreed upon, may be settled at any time upon three days' notice.

Ordered accordingly.